T.C. Memo. 2018-146

UNITED STATES TAX COURT

CHAMPIONS RETREAT GOLF FOUNDERS, LLC., RIVERWOOD LAND,
LLC., TAX MATTERS PARTNER, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 4868-15.                    Filed September 10, 2018.

Vivian D. Hoard, for petitioner.

Teri L. Jackson and John P. Healy, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PUGH, Judge:  After concessions, the issue for decision is whether

Champions Retreat Golf Founders, LLC (Champions Retreat), is entitled to a

$10,427,435 charitable contribution deduction related to the donation of a

qualified conservation contribution for the 2010 taxable year disallowed by

[*2] respondent in a notice of final partnership administrative adjustment (FPAA) issued on November 19, 2014.[1]

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. Champions Retreat is a Georgia limited liability company with a principal place of business in Augusta, Georgia. Champions Retreat was formed on November 6, 2001, to develop and operate a golf club. As of the 2010 taxable year, Champions Retreat Golf Management, LLC, owned a 21.556% interest in Champions Retreat; Robert W. Pollard owned a 17.442% interest; Riverwood Land, LLC (Riverwood Land), owned a 17.1024% interest; Kiokee Creek owned a 15% interest; William F. Paine owned a 7.718% interest; Meybohm Realty, Inc., owned a 4.114% interest; and Wayne K. Millar owned a .5172% interest. The remaining interest--approximately 16.6%--was held by 32 other partners, each of whom owned a .5172% interest.

---

[1] Respondent conceded that Champions Retreat did not make a disguised sale to Kiokee Creek Preservation Partners, LLC (Kiokee Creek). Respondent also conceded that Champions Retreat's allocation of the charitable contribution deduction at issue had substantial economic effect. Finally, respondent conceded that Champions Retreat complied with sec. 704 in decreasing the capital accounts of the members receiving allocations of the charitable contribution deduction and in properly allocating interest income and ordinary business loss to its members.

All section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. All monetary amounts are rounded to the nearest dollar.

[*3] Riverwood Land is a limited liability company with a principal place of business in Augusta. As of the 2010 taxable year, Meybohm Realty and Mr. Pollard each owned a 40% interest and M-Golf, Inc., which is solely owned by Mr. Millar, owned the remaining 20%.

I. Development of the Golf Club

The easement at issue was placed on part of a 2,215-acre tract of land owned by Canal Industries before 2000 along the Savannah River in Evans, Georgia, approximately 13 miles from Augusta. Canal Industries hired Mr. Millar to develop a golf course on the property because of his relationship with golf legend Gary Player. On August 28, 2000, Pollard Land, Mr. Pollard's timberland investment firm, purchased the property from Canal Industries at the behest of Mr. Millar and E.G. Meybohm, who owns Meybohm Realty. In 2001 Riverwood Land began to develop a portion of the property and marketed it as Riverwood Plantation. On April 5, 2002, Pollard Land conveyed a 463.3-acre tract to Champions Retreat to build a golf club, which became Champions Retreat Golf Club (golf club).

Champions Retreat raised an initial $13.2 million for construction of the golf club by selling 66 residential lots in a development called Founders Village. A lifetime membership at the golf club and an ownership share in Champions

[*4] Retreat was included in the purchase of a lot in Founders Village. In addition to the $13.2 million, Champions Retreat borrowed heavily in order to complete construction of the golf club. The golf club was completed in June 2005.

The golf club is in a section of Riverwood Plantation called the Reserve. The Reserve is private and can be accessed only through a security gate, which is manned 24 hours a day. Along with the golf club and Founders Village, the Reserve includes Bishops Court, the Cottages at Riverwood Plantation (Cottages), and the Bungalows at Champions Retreat (Bungalows). Bishops Court is a residential development separate from the golf club. The Cottages and the Bungalows provide guest accommodations. The Cottages adjoin the golf course.

The golf club accounts for 365.56 acres of the 463.3-acre tract that Champions Retreat acquired in 2002. Photos and videos in the record show it to be a visually beautiful, manicured property. It features a 27-hole course (made up of three 9-hole courses), a pro shop, a restaurant, a locker room, a cart storage facility, a driving range and practice area, and a paved parking lot. Mr. Player, Arnold Palmer, and Jack Nicklaus each designed one of the nine-hole courses. Mr. Player designed the Creek course; Mr. Palmer designed the Island course; and Mr. Nicklaus designed the Bluff course.

**[*5]**   The Creek course is the westernmost of the three courses, and it almost completely surrounds the Founders Village development.  Due east of the Creek course is the driving range.  The Bluff course is to the north-northeast of the driving range.  The Island course is due east of the driving range.  The Little River--an offshoot of the Savannah River that goes around Germain Island--runs through the Island course.  Six of the nine holes on the Island course are on Germain Island.  The banks of this part of the Savannah River are anywhere from 3 to 10 feet high.  Sumter National Forest, which is approximately 120,000 acres, lies across the Savannah River, 700 feet from the golf club.

## II.  Donation of the Easement

Champions Retreat was not profitable.  After our decision in Kiva Dunes Conservation, LLC v. Commissioner, T.C. Memo. 2009-145, Douglass Cates, the accountant for Champions Retreat, proposed the donation of a conservation easement on the property including the golf club.  The proposal was meant, among other things, to attract additional investment in Champions Retreat so that it could pay down its debt and remaining construction costs.

[*6]  Lee Echols, a conservation biologist with the North American Land Trust (NALT),[2] performed an initial survey of the property on November 30 and December 1, 2009.  The initial survey consisted of a tour of the property to document and photograph any significant natural features or significant species or natural communities on the property for the purpose of determining a conservation purpose.  Mr. Echols determined in 2009 that the property met the requirements for a conservation easement.

Kiokee Creek, a Georgia partnership, was formed on September 24, 2010, as a vehicle for investing in Champions Retreat.  Its 15 original members, most of whom were Mr. Cates' clients, contributed a total of $2,705,000 for their interests.  In November 2010 Kiokee Creek contributed $2,700,000 to Champions Retreat in exchange for a 15% interest.

Mr. Echols returned to Champions Retreat on November 12, 2010, to perform another site visit.  Mr. Echols again determined that the property was suitable for a conservation easement and, on December 16, 2010, Champions Retreat conveyed an easement to NALT that covered 348.51 acres (easement area).  The easement was recorded on December 29, 2010, in the deeds records of

_____

[2] NALT is registered as a charitable organization in Pennsylvania and has tax-exempt status under sec. 501(c)(3).

[*7] Columbia County, Georgia. NALT acknowledged Champions Retreat's donation of the easement on February 7, 2011.

Mr. Echols returned to the golf club again on May 12, 2011, so that NALT could have a record of the significant natural features of the property throughout the year. This followup visit, although after the conveyance of the easement, was included in NALT's baseline documentation that Champions Retreat submitted to the Internal Revenue Service (IRS). No representative of Champions Retreat signed the owner acknowledgment line in the documentation.

Champions Retreat claimed a $10,427,435 charitable contribution deduction on its Form 1065, U.S. Return of Partnership Income, for the 2010 taxable year for its donation of the easement to NALT. Champions Retreat allocated approximately 98.8% of the deduction to Kiokee Creek, the remaining 1.2% of the deduction to Riverwood Land, and none to the other 37 members.

III. Terms of the Easement

The easement document identifies three conservation purposes:

Preservation of the [easement] area as a relatively natural habitat of fish, wildlife, or plants or similar ecosystem; and

Preservation of the [easement] area as open space which provides scenic enjoyment to the general public and yields a significant public benefit; and

[*8]  Preservation of the [easement] area as open space which, if preserved, will advance a clearly delineated Federal, State, or local governmental conservation policy and will yield a significant public benefit * * *.

The easement document imposes several restrictions on Champions Retreat. It restricts the ways that Champions Retreat can use the easement area, including the types of structures that Champions Retreat can build on the easement area. It requires Champions Retreat to use "the best environmental practices then prevailing in the golfing industry" in maintaining the golf club, to keep records relating to maintenance of the golf club, and to submit an annual maintenance report to NALT. In addition, Champions Retreat cannot remove surface or ground water, live or dead trees, or any other raw materials from the easement area. It cannot put up signs or outdoor advertising or construct any new roads on the easement area. It must protect the bodies of water on or near the easement area; creeks and ponds cannot be manipulated, no chemical discharge can be allowed to flow into a creek or pond, no vegetation within 100 feet of a creek or pond can be cleared, and Champions Retreat must take care not to cause soil erosion and sedimentation. The easement document prohibits the division of the easement area into lots and requires Champions Retreat to notify NALT in writing before it exercises a reserved right in a way that may impair the conservation purposes underlying the donation.

[*9] The easement document allows several exceptions to those restrictions. Champions Retreat can build additional structures of up to an aggregate 10,000 square feet on the easement area and can remove trees and vegetation to do so, and it can shift around greens, fairways, and other features of the golf courses. It can pave and widen an existing road by 10 feet. Champions Retreat has the right to "[m]aintain in good and manicured condition the * * * fairways, greens, tee boxes, sand traps, waste bunkers, areas in the rough, and other Golf Course play areas including any lakes, ponds, and other water courses which are an integral part of the Golf Course". This includes the right to use chemicals. It also has the right to remove any tree--whether standing or fallen--that is within 30 feet of a playable area. Champions Retreat must give NALT written notice before it exercises these or any other rights reserved to it in the easement document, and NALT must give its written approval for the exercise of the right.

IV. Natural Features of the Easement Area

The 348.51-acre easement area includes 25 of the 27 holes in their entirety, most of the 2 remaining holes, and the driving range. It does not include the parking lot, the pro shop, the restaurant, the locker room, the cart storage facility, the Cottages, the Bungalows, or Founders Village.

**[*10]** A.  <u>Plants, Animals, and Aquatic Life on the Easement Area</u>

The easement area is in the Lower Piedmont region, which runs from Virginia to Georgia.  The Lower Piedmont region tends to be characterized by three types of habitat:  (1) Piedmont oak-pine-hickory forest, which is characterized by large canopy trees; (2) Piedmont pine-oak woodlands and forest, which has a more open canopy but a greater presence of subcanopy trees; and (3) Piedmont floodplains and bottomlands, which are wetland forests that occur along rivers and creeks.  While efforts were made to preserve the natural beauty of the easement area--especially certain trees--trees were cut down and vegetation was removed during the construction of the golf club.  Indeed, the open pine woodlands and savannas in the easement area exhibit very little plant species diversity.  However, swaths of wetland, bottomland and riparian forest, and open pond habitat survived the development and remain undisturbed.  The two largest undisturbed swaths are the 31 acres to the west of the Little River and the 26 acres on Germain Island.  Together these account for a little over 16% of the easement area.

Species observed in the easement area are monitored by conservation organizations.  NatureServe is a large, umbrella conservation group that relies on reports from biologists around the world to classify natural communities and to

[*11] track species of conservation concern. NatureServe's ranking system for the threat level to a species also is used by each State's Natural Heritage Program, which tracks species of conservation concern on a State level. Although not all States fund this program, scientists continue to contribute observations. The NatureServe rankings are G1 through G5; the G stands for global, G1 is the highest threat level, and G5 is the lowest. The State rankings are the same except that S stands for State.

Several bird-specific conservation organizations also track bird species of concern. Partners in Flight (PIF) has five threat levels, from Possibly Extinct, at the highest level, to Planning and Responsibility, at the lowest.[3] The Atlantic Coast Joint Venture (ACJV) ranks the threat to birds from Highest Priority to Moderate Priority.[4] The North American Bird Conservation Initiative (NABCI) puts birds facing the most serious threats on the Red Watch list and birds facing less serious threats on the Yellow Watch List. The U.S. Fish and Wildlife Service

---

[3] For PIF the threat levels are, from highest to lowest, (1) Possibly Extinct, (2) Critical Recovery, (3) Immediate Management, (4) Management Attention, and (5) Planning and Responsibility.

[4] For ACJV the threat levels are, from highest to lowest, (1) Highest Priority, (2) High Priority, and (3) Moderate Priority.

[*12] -- Birds of Conservation Concern 2008 (USFWS) lists bird species that may be candidates for listing under the Endangered Species Act of 1973.

The table below lists the bird species observed in the easement area that are of conservation concern, according to one or more of these conservation organizations:

| Name | PIF | ACJV | NABCI | USFWS |
|---|---|---|---|---|
| Belted Kingfisher | Management Attention | -- | -- | -- |
| Brown-headed Nuthatch | Planning and Responsibility | High | -- | Yes |
| Carolina Chickadee | Planning and Responsibility | Moderate | -- | -- |
| Carolina Wren | Planning and Responsibility | -- | -- | -- |
| Downy Woodpecker | Planning and Responsibility | -- | -- | -- |
| Eastern Kingbird | Management Attention | Moderate | -- | -- |
| Eastern Phoebe | Planning and Responsibility | -- | -- | -- |
| Eastern Wood Pewee | Management Attention | Moderate | -- | -- |
| Pine Warbler | Planning and Responsibility | -- | -- | -- |

[*13]

| Red-Headed Woodpecker | Planning and Responsibility | Moderate | Yellow Watchlist | -- |
|---|---|---|---|---|
| Tufted Titmouse | Planning and Responsibility | -- | -- | -- |

In addition to birds, two other notable species of conservation concern were observed in the easement area. The southern fox squirrel has a G5 ranking from NatureServe but is not tracked by Georgia's Natural Heritage Program. The southern fox squirrel is a game species in Georgia; there is a six-month hunting season during which hunters can catch up to 12 per day. The denseflower knotweed is a plant found in the easement area's bottomland forest and swamp habitats. NatureServe gives it a G5 global ranking and indicates that it has an S1? State ranking in Georgia (the "?" indicating uncertainty). Georgia's Natural Heritage Program lists it with an S3? ranking. This discrepancy seems due to NatureServe's use of outdated information regarding Georgia's Natural Heritage Program.

In the easement area, aquatic life was observed in the man-made water features. Several native species of fish were observed in ponds, such as blueback herring, bluegill, mosquitofish, largemouth bass, and brown bullhead catfish. Some of the larger ponds in the easement area were clear, an indication of a

[*14] healthy aquatic environment. Others were green and opaque, however, an indication of water quality problems. The streams in the easement area offered low quality aquatic environments; they exhibited little variety of aquatic life and one emitted a sulfurous odor and had an oily sheen.

B. Maintenance in the Easement Area

Champions Retreat maintained the golf club meticulously. It installed two nonnative grasses on the fairways and on the greens. Champions Retreat chose Bermuda grass for the fairways because it would enhance playability and because it is suitable for warm temperatures. The bentgrass planted on the greens was suitable for cooler temperatures and required fans to keep it cool. Champions Retreat's mowing fleet included large riding mowers, which it used on the fairways; walk-behind mowers, which it used on the greens and the tee boxes; and smaller tools such as leaf blowers, hedge trimmers, and weed eaters. Champions Retreat generally mowed the fairways every other day and kept them at a height of approximately a quarter of an inch. It kept the bentgrass on the greens at an approximate height of an eighth of an inch and the grass on the rough at about three inches.

The easement area includes several man-made water features, in addition to the Savannah and Little Rivers and wetlands on their banks. Most are ponds,

[*15] although there are also man-made "creeks". Certain of the ponds were used to provide water throughout the courses. Some were used to feed the man-made creeks; pumps took water from the pond up to the top of the creek from where it would flow back down into the pond. One pond was used to irrigate the entire golf club; anywhere from 70,000 to 600,000 gallons of water (depending on the day) was pumped from the Little River into the pond and then distributed around the golf club. Champions Retreat used weed eaters to mow up to the edges of some of the man-made ponds and creeks. And the staff mowed to within 5 or 10 feet of the banks of the Savannah and Little Rivers.

Champions Retreat used several chemicals on the golf club's courses that were subject to regulations. The chemicals were applied by licensed members of Champions Retreat's staff or under their supervision. Georgia Department of Agriculture rules governed the application of certain of the chemicals, and Champions Retreat complied with those requirements.

Champions Retreat sprayed fungicides throughout the golf club. They were used primarily to kill fungi on the greens but also were used on the fairways and tee boxes. The staff members applying the fungicides were required to wear protective gear, such as gloves and a respirator, while spraying. Champions Retreat also applied herbicides or plant growth regulators to the courses,

[*16] specifically the fairways, the rough, the tee boxes, and the greens. The herbicides were meant to prevent the growth of or to kill unwanted plants on the golf courses. Plant growth regulators were meant to make plants short and stubby, reducing the amount of maintenance needed on the golf courses. Staff applying the herbicides and plant growth regulators were required to wear gloves and respirators although certain of the herbicides required the use of coveralls, covering the applicator up to the waist.

Champions Retreat used insecticides on the greens and tee boxes to prevent the spread of ants and mole crickets and algaecide on the man-made ponds and creeks to control algae. Champions Retreat also applied fertilizer to the golf courses to revive grass that had been damaged by divots, golfers who deviated from the cart paths, and winter weather. It applied fertilizers to small areas by broadcast spreader and to larger areas by truck.

Some of the chemicals used on the golf courses had environmental hazards associated with their use. Several chemicals, including some applied to pond banks, were toxic to fish and aquatic invertebrates if introduced into their habitats, through either direct application or runoff. Fertilizer used on the golf courses also could cause water quality problems such as eutrophication if it made its way into the ponds.

[*17] Some of the holes drain into the creeks and ponds in the easement area and into swaths of undisturbed wetlands and forest area. One hole on Germain Island --hole 4 on the Island course--drains into a 26-acre swath of wetlands on the island. Additionally, two holes--hole 2 on the Island course and hole 8 on the Bluff course--drain into a 31-acre swath of wetlands just to the west of the Little River.

C. The Easement Area and Public Use

Local residents frequently used the Savannah River--including the Little River--for recreational purposes such as kayaking, fishing, or duck hunting. The Benderdinker Festival--a community boating event held annually that included upwards of 800 people--also was held annually on the Savannah and Little Rivers, taking participants in a loop around Germain Island. In 2013 there was a dispute over whether the Benderdinker Festival could use the Little River while Champions Retreat was hosting a golf tournament, which turned on whether the Little River was a public waterway or was privately owned by Champions Retreat. Champions Retreat eventually gave its permission, but whether the Little River is public or private remains unresolved.

In addition to the Benderdinker Festival, several other events are held annually at or around the golf club: the Augusta Charity Classic golf tournament,

[*18] the Guardian Cup Charity golf tournament, the YMCA Cloverleaf Duathalon, the United Way Charity Classic golf tournament, the Christmas at Champions Retreat holiday festival, the Island Run 3.1, and the Birdies for the Brave golf event.

Euchee Creek runs near the southern border of the easement area. It opens into the Little River, but a dam at the mouth of the creek limits access from the Little River. The Columbia County Planning Commission proposed a network of trails in 2007 called the Euchee Creek Greenway. The route proposed in 2007 would have overlooked the golf club from across the creek. Because of revisions in the proposed route, however, the Euchee Creek Greenway was not routed to overlook the golf club as of the time of trial.

Columbia County participated in the now-defunct Georgia Greenspace Program, which assisted counties in funding acquisition of property rights to permanently conserve sensitive or natural areas that met specifications designated under State law. The golf club was not designated greenspace under this program. The easement area was designated open space by the Columbia County Planning Commission for purposes of its Comprehensive Plan, Vision 2035 (Vision 2035). Vision 2035, which was developed pursuant to a State planning law, is not connected with Columbia County's implementation of the Georgia Greenspace

**[*19]** Program. There is no application process for an open space designation under Vision 2035, and landowners are not required to submit anything for such a designation to be made. All golf courses in Columbia County are designated open space under Vision 2035.

## V. The FPAA

The FPAA denied Champions Retreat's deduction of $10,427,435 for the contribution of the easement on two alternative grounds: (1) the conservation easement did not met the requirements of section 170 and (2) the easement did not have a value greater than zero. Riverwood Land, the tax matters partner, timely petitioned for redetermination.

## OPINION

## I. Burden of Proof

Ordinarily, the taxpayer bears the burden of proving that the Commissioner's determinations are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Deductions are a matter of legislative grace, and taxpayers bear the burden of proving entitlement to any deductions claimed. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).

[*20] Petitioner asserts that it has provided complete and conclusive documentation and credible testimony to show Champions Retreat's compliance with section 170(h) sufficient to shift the burden of proof under section 7491(a). Under section 7491(a)(1), "[i]f, in any court proceeding, a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer for any tax imposed by subtitle A or B, the Secretary shall have the burden of proof with respect to such issue." See Higbee v. Commissioner, 116 T.C. 438, 442 (2001) ("Credible evidence is the quality of evidence which, after critical analysis, the court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted (without regard to the judicial presumption of IRS correctness)." (quoting H.R. Conf. Rept. No. 105-599, at 240-241 (1998), 1998-3 C.B. 747, 994-995)). The resolution of the issue in this case does not depend on which party has the burden of proof. We resolve it on a preponderance of the evidence in the record. See Knudsen v. Commissioner, 131 T.C. 185, 189 (2008); Schank v. Commissioner, T.C. Memo. 2015-235, at *16.

II. Qualified Conservation Contributions

Taxpayers are allowed a deduction for charitable contributions made in a taxable year. Sec. 170(a)(1). A charitable contribution is a contribution or gift to

[*21] or for the use of an organization that meets the requirements set out in section 170(c). No deduction generally is allowed for the contribution of an interest in property that is less than the taxpayer's entire interest. Sec. 170(f)(3)(A). A taxpayer can claim a deduction under section 170 for contributions of three particular partial interests in property: (1) a contribution of a remainder interest in a personal residence or farm, (2) a contribution of an undivided portion of the taxpayer's entire interest in a property, and (3) a qualified conservation contribution. Sec. 170(f)(3)(B). A qualified conservation contribution is defined as a contribution of a qualified real property interest to a qualified organization, made exclusively for conservation purposes. Sec. 170(h)(1). The parties agree that Champions Retreat's contribution to NALT was a qualified real property interest and that NALT is a qualified organization. See secs. 170(h)(2) and (3). We must decide whether Champions Retreat's contribution was exclusively for conservation purposes.

III. Conservation Purpose

A contribution is treated as made exclusively for conservation purposes if it satisfies one of the conservation purposes listed in section 170(h)(4). Champions Retreat argues that the contribution of the easement to NALT satisfies two conservation purposes: (1) "the protection of a relatively natural habitat of fish,

[*22] wildlife, or plants, or a similar ecosystem" and (2) "the preservation of open space (including farmland and forest land) where such preservation is * * * for the scenic enjoyment of the general public, or * * * pursuant to a clearly delineated Federal, State, or local governmental conservation policy, and will yield a significant public benefit".  Sec. 170(h)(4)(A)(ii) and (iii).  We will address each of these below.

Both Champions Retreat and respondent presented expert testimony as to whether the easement area satisfied the conservation purpose requirement.  Several experts testified on behalf of Champions Retreat:  Keith Lawrence on land planning and civil engineering;[5] Leslie Ager on fisheries biology; Christopher Wilson on wildlife biology and conservation; and Lee Echols, of NALT, on botany, conservation biology, and ecology.  Reed Noss testified for respondent on conservation biology.  All of the experts were qualified and credible; they differed primarily on the conclusions we should draw from their observations.  We will address their testimony in the context of our analysis.

---

[5] Mr. Lawrence is employed by Meybohm Realty and was involved in designing Riverwood Plantation, including the golf club.

**[*23]** A. <u>Relatively Natural Habitat</u>

A taxpayer may satisfy the conservation purpose requirement if its contribution protects "a relatively natural habitat of fish, wildlife, or plants, or a similar ecosystem." Sec. 170(h)(4)(A)(ii). The habitat must be a "significant relatively natural habitat in which a fish, wildlife, or plant community, or similar ecosystem normally lives". Sec. 1.170A-14(d)(3)(i), Income Tax Regs. A habitat is "'[t]he area or environment where an organism or ecological community normally lives or occurs' or '[t]he place where a person or thing is most likely to be found.'" <u>Glass v. Commissioner</u>, 124 T.C. 258, 281-282 (2005) (quoting American Heritage Dictionary of the English Language 786 (4th ed. 2000)), <u>aff'd</u>, 471 F.3d 698 (6th Cir. 2006). A significant relatively natural habitat can include but is not limited to "habitats for rare, endangered, or threatened species of animals, fish, or plants; * * * and natural areas which are included in, or which contribute to, the ecological viability of a local, state, or national park, nature preserve, wildlife refuge, wilderness area, or other similar conservation area." Sec. 1.170A-14(d)(3)(ii), Income Tax Regs. Some human alteration of a significant relatively natural habitat will not result in the denial of a deduction, as long as "the fish, wildlife, or plants continue to exist there in a relatively natural state." <u>Id.</u> subdiv. (i).

**[*24]**     1.  <u>Rare, Endangered, or Threatened Species</u>

Champions Retreat argues that the easement area provides a habitat for several species of conservation concern, namely, birds, the southern fox squirrel, and the denseflower knotweed.  We agree with Champions Retreat that "rare, endangered, or threatened", which is undefined in the regulations, should not be limited to species listed under the Endangered Species Act of 1973, Pub. L. No. 93-205, sec. 4, 87 Stat. at 886-887 (codified as amended at 16 U.S.C. sec. 1533 (2012)).  <u>See</u> sec. 1.170A-14(d)(3)(ii), Income Tax Regs.  Nonetheless, we do not find a sufficient presence of rare, endangered, or threatened species in the easement area to satisfy the conservation purpose requirement.

Mr. Echols and Mr. Wilson each observed several species of birds that were on conservation watchlists.  Half of the species observed were listed only by PIF, which, as Mr. Wilson notes, "is the most inclusive and includes species that are quite common * * * but are nonetheless considered important for conservation and planning purposes based on other factors."  Moreover, all of the species listed by PIF that both Mr. Echols and Mr. Wilson observed were ranked as either Planning and Responsibility or Management Attention, the lowest and second lowest rankings, respectively.  Five of the twelve species that both Mr. Echols and Mr. Wilson observed were listed by the ACJV.  All five of the species listed by ACJV

**[*25]** that were observed were listed as Moderate--for species with larger populations and subject to less serious threats--except one, the brown-headed nuthatch, which is listed as High, the middle threat level. The brown-headed nuthatch also is ranked by PIF as Planning and Responsibility, the lowest threat level. The red-headed woodpecker is the only bird observed by the experts that is tracked by NABCI and is on the Yellow Watch List, which indicates a lower threat level. Both PIF and ACJV assigned the red-headed woodpecker their lowest threat levels. Only 1 of the 12 birds that both Mr. Echols and Mr. Wilson observed is tracked by the USFWS--the brown-headed nuthatch.

The expert testimony, while credible, leaves us unpersuaded that there is a sufficient presence of rare, endangered, or threatened bird species on the easement area. None of the bird species observed by both Mr. Echols and Mr. Wilson were assigned the highest threat level by any of the conservation organizations. And although the brown-headed nuthatch was labeled High Priority by ACVJ and tracked by USFWS, PIF ranked it as Planning and Responsibility, which denotes species that are not of regional concern. See Atkinson v. Commissioner, T.C. Memo. 2015-236, at *36 (holding that a species present in the easement area classified as "only one step above 'apparently secure'" does not satisfy the conservation purpose requirement).

[*26] The only other species tracked by conservation organizations and observed by the experts on the easement area are the southern fox squirrel and the denseflower knotweed. While both Champions Retreat's and respondent's experts agreed that southern fox squirrels may be in decline, we cannot conclude from their expert testimony that they are rare, endangered, or threatened.[6] They have a G5 NatureServe ranking, which indicates that they are demonstrably secure globally, are not ranked at all by Georgia's Natural Heritage Program, and are still hunted legally in Georgia.

Denseflower knotweed also has a G5 ranking from NatureServe. Its statewide ranking is unclear; NatureServe gives it an S1? ranking in Georgia while Georgia's Natural Heritage Program gives it an S3? ranking. Notwithstanding the uncertainty of its status in Georgia, Mr. Echols testified that the denseflower knotweed is found almost exclusively in the 26-acre swath of bottomland forest on Germain Island. This swath accounts for about 7.5% of the easement area.

---

[6] Petitioner repeatedly cited an article attached to Mr. Wilson's expert report regarding southern fox squirrels in support of Champions Retreat's position. But the author did not testify, nor was the article admitted as evidence. Moreover, petitioner tried but was unable to secure his testimony as an expert, and we quashed the trial subpoena petitioner then issued to him as we viewed the testimony petitioner sought to be in the nature of expert testimony. Petitioner's continued reliance on the article, therefore, is improper, and we do not rely on the article for any facts.

[*27] Assuming that denseflower knotweed could flourish in both swaths of undisturbed bottomland forest in the easement area, its found suitable habitat would constitute less than 17% of the easement area. Moreover, hole 4 on the Island course was designed to drain into the only swath of bottomland forest on the easement area in which the denseflower knotweed is found, introducing the chemicals used by Champions Retreat (albeit legally and in accordance with the easement)--including herbicides--into its habitat. Less than 17% of the easement area is not enough to fulfill the conservation purpose of providing a significant relatively natural habitat. See Atkinson v. Commissioner, at *35 (holding that a plant found on 24% of the easement area was "too insignificant" to lead the Court to conclude that the easement area was a significant relatively natural habitat).

Champions Retreat has presented evidence of only one rare, endangered, or threatened species with a habitat on the easement area--denseflower knotweed-- and it inhabits just a small fraction of the easement area. To get around these facts, Champions Retreat would have us ignore the specific wording of the regulation and adopt a standard that includes any species of current or future conservation concern. This we cannot do. Even its own expert, Mr. Wilson, testified that a species' listing on one of the rankings of conservation concern is not by itself enough: "While important, these lists are not (by themselves) the best

[*28] references for determining the conservation significance of a species or its habitat, or for prioritizing conservation actions and guiding habitat protection." We, therefore, conclude that Champions Retreat has not met the conservation purpose requirement by providing a "habitat[] for rare, endangered, or threatened species of animals, fish, or plants". See sec. 1.170A-14(d)(3)(ii), Income Tax Regs.

### 2. Contributes to Ecological Viability

Champions Retreat also contends that the easement area is a relatively natural habitat because it is a natural area that contributes to the ecological viability of Sumter National Forest, across the Savannah River. Mr. Wilson testified that birds, insects, and pollen will travel back and forth between the easement area and Sumter National Forest, enhancing the ecological viability of each. Dr. Noss testified that the easement area is not a natural area.

We have no doubt that Sumter National Forest is a "national park", in the terms of the regulation. However, we do not find the easement area to be a natural area. Mr. Echols and Mr. Wilson testified that parts of the easement area between fairways resembled open pine woodlands or savannas. Together with the fairways, greens, and tee boxes, the areas that resemble open pine woodlands make up most of the easement area. Mr. Wilson described these areas as

**[*29]** "obviously the least natural areas of the property, consisting of non-native grass and maintained through heavy management utilizing chemical fertilizers, pesticides, and fungicides." Dr. Noss testified that the open pine areas on the easement area do not approach the rich plant and animal diversity that generally characterizes an open pine woodland because--like the fairways, greens, and tee boxes--they are planted with nonnative grasses and treated to prevent the growth of native plants at the base of trees. Contrary to Champions Retreat's claim, just having "trees and vegetation as well as many species that * * * inhabit" them is not enough to constitute a natural area when those trees and vegetation are heavily managed. And the mere fact that a species might inhabit an area--making it "suitable"--does not make it "natural". See Atkinson v. Commissioner, at *41 (holding that the golf course did not contribute to the ecological viability of an adjacent nature preserve because "[a] large portion of the 2003 easement property is planted with nonnative grass, the ponds do not exist in a relatively natural state, and the native forests that do remain on the 2003 easement property are at risk of removal pursuant to the terms of the 2003 easement deed").

Even were we to find that the areas resembling open pine woodlands were natural areas, there is no guaranty that they will be protected. The easement allows the removal of any tree--whether standing or fallen--that is within 30 feet

[*30] of a playable area. From the photographs in both Mr. Echols' and Mr. Wilson's expert reports, it appears that several of the trees in these areas would be eligible for removal under the Easement.

Mr. Ager testified that the ponds he surveyed in the easement area were high-quality aquatic environments. However, the chemicals that Champions Retreat uses in the easement area could injure those environments. Some of the chemicals are harmful to aquatic life if they come into contact with water courses, whether applied directly or through runoff. Some of the holes were designed to channel runoff water towards the creeks, ponds, and bottomland forest and wetland areas on the easement area. The experts also agreed that fertilizer quickens the process of eutrophication, which can lead to water quality problems as well.[7]

Champions Retreat contends that its use of chemicals in the easement area should not preclude a deduction in this case because it complied with the applicable State rules. The terms of the easement allow Champions Retreat to apply chemicals so long as it follows "the best environmental practices then prevailing in the golf industry". We have no doubt that Champions Retreat aims

---

[7] The experts did not agree on the extent to which the ponds in the easement area were eutrophic.

**[*31]** to use the chemicals responsibly, but it did not establish that the best environmental practices in the golf industry are as good as or better than "the best environmental practices then prevailing for conservation, as might be expected if conservation was the purpose of the easement." See Atkinson v. Commissioner, at *38.

We also cannot conclude that the easement area is a natural area that contributes to the ecological viability of Sumter National Forest across the Savannah River. The experts disagreed as to how many species observed in the easement area have a range that spans the Savannah River or would even be capable of making the 700-foot flight across the river between the easement area and the national forest. And we are unable to conclude that the species we described above as of interest have a range so large.

Because we find that the easement area neither provides a habitat for rare, threatened, or endangered species nor is a natural area that contributes to the ecological viability of Sumter National Forest, we find that Champions Retreat's contribution was not made for the conservation purpose of protecting a relatively natural habitat.

**[\*32]** B.  <u>Preservation of Open Space</u>

A contribution also can satisfy the conservation purpose requirement in section 170(h) if it preserves open space.  Sec. 170(h)(4)(A)(iii).  The preservation must be either for the scenic enjoyment of the general public or pursuant to a clearly delineated Federal, State, or local governmental conservation policy.  Sec. 170(h)(4)(A)(iii).  In either case, the preservation of open space must yield a significant public benefit.  <u>Id.</u>

   1.  <u>Scenic Enjoyment</u>

The preservation of open space can be for the scenic enjoyment of the general public if "development of the property * * * would interfere with a scenic panorama that can be enjoyed from a park, nature preserve, road, waterbody, trail, or historic structure or land area, and such area * * * is open to, or utilized by, the public."  Sec. 1.170A-14(d)(4)(ii)(A), Income Tax Regs.  Satisfaction of the scenic enjoyment requirement depends on visual access to the property rather than physical access.  <u>Id.</u> subdiv. (ii)(B).  It is not necessary that visual access to the whole property be available to the general public, but visual access to too small a portion may be insufficient.  <u>Id.</u>  Scenic enjoyment is evaluated by taking into account all relevant facts and circumstances.  <u>Id.</u> subdiv. (ii)(A).

**[*33]** The easement area is located in the private section of Riverwood Plantation and is accessible only to members and their guests, through a gate manned 24 hours a day. Even taking into account the annual charity events held at the golf club, we conclude that the public does not have sufficient physical access to enjoy the easement area.

And, because of the limited physical access, the public could view the easement area only from the Savannah and Little Rivers, so visual access is limited to the areas adjacent to the those rivers. The extent to which the general public can see the easement area from the rivers is limited further by the 3- to 10-foot river banks. Finally, uncertainty persists regarding public access to the Little River. Thus, we conclude that the contribution of the easement area was not for the scenic enjoyment of the general public.

### 2. Pursuant to Governmental Conservation Policy

A contribution for the preservation of open space is pursuant to a clearly delineated governmental conservation policy if it "further[s] a specific, identified conservation project". Sec. 1.170A-14(d)(4)(iii)(A), Income Tax Regs. While the program need not identify individual lots or parcels of land for certification, it does need to be more than a general declaration of conservation goals. Id. A government program need not be funded for a contribution to satisfy this

[*34] requirement, but there must be a significant commitment from the government to the conservation project. Id. The regulations give, as an example of a contribution that meets this requirement, "the donation of a perpetual conservation restriction to a qualified organization pursuant to a formal resolution or certification by a local governmental agency established under state law specifically identifying the subject property as worthy of protection for conservation purposes". Id.

Champions Retreat contends that it made the contribution of the easement to preserve open space pursuant to a Georgia law directing the Georgia Department of Natural Resources and local governments to promulgate minimum standards "for the protection of the natural resources, [the] environment, and vital areas of the state, including, but not limited to, * * * the protection of river corridors". Ga. Code Ann. sec. 12-2-8(b) (2018). Champions Retreat also contends that it made this contribution pursuant to Columbia County's implementation of the Georgia Greenspace Program.

We conclude that the Georgia statute cited by Champions Retreat does not support an "identified conservation project", nor is there evidence that the Greenspace Program designated the easement area "as worthy of protection for conservation purposes" or that NALT's easement on the easement area is held

[*35] under the Greenspace Program. See sec. 1.170A-14(d)(4)(iii)(A), Income Tax Regs.

Champions Retreat argued at trial that the designation of the golf club as open space under the Columbia County Planning Commission's Vision 2035 plan showed that its contribution was pursuant to a local governmental conservation policy. While the Planning Commission did produce Vision 2035 pursuant to State law, it was not a law focused on conservation but rather on land development. We thus conclude that the preservation of open space was not pursuant to a clearly delineated governmental conservation policy.

We need not consider whether Champions Retreat's preservation of open space yields significant public benefit--as required by section 170(h)(4)(iii)(A)--because we find that it was neither for the enjoyment of the general public nor pursuant to a clearly delineated governmental conservation policy.

IV. Conclusion

Champions Retreat is not entitled to a deduction for a qualified conservation contribution for the 2010 tax year because it has not satisfied the conservation purpose requirement of section 170(h). Because we have determined that its contribution was not made for a conservation purpose, we do not reach whether any of the retained rights in the easement permit a use of the easement area that is

[*36] inconsistent with an accomplished conservation purpose, whether the baseline documentation is sufficient to allow NALT to police the future exercise of the retained rights in the easement area, or whether the value of the easement contribution is greater than zero. See sec. 1.170A-14(e)(2), (g)(5)(i), (h), Income Tax Regs. We have considered all other arguments made and facts presented in reaching our decision, and, to the extent not discussed above, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

Decision will be entered

for respondent.